## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 30 2018, 9:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Melinda K. Jackman-Hanlin
Greencastle, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy
Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Termination of the Parent-Child Relationship of:
M.R. *(Minor Child)*

and

S.H. *(Mother)* and R.R. *(Father)*,

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

November 30, 2018

Court of Appeals Case No.
18A-JT-1437

Appeal from the Putnam Circuit Court

The Honorable Matthew Headley, Judge

Trial Court Cause No.
67C01-1801-JT-1

**Robb, Judge.**

# Case Summary and Issue

[1] S.H. ("Mother") and R.R. ("Father") appeal the juvenile court's order terminating their parental rights to M.R. ("Child"), raising one issue for our review: whether the juvenile court's judgment terminating Mother and Father's parental relationship with Child was clearly erroneous. Concluding it is not, we affirm.

# Facts and Procedural History

[2] Child was born to Mother and Father on May 5, 2003. Mother and Father have a history with the Indiana Department of Child Services ("DCS") that began in July 2007 when Child reported sexual abuse by Father—a report which was later substantiated by DCS. On December 3, 2015, DCS received a report alleging Child had been abducted and raped. Child alleged that an unknown male picked her up at her bus stop and raped her in his vehicle while they were parked along the highway. In an interview, Child admitted the story was fabricated to get Father's attention. Linda Connors, the family case manager, notified Mother that an additional report had been made the previous night alleging Child was raped by her step-father. Mother stated Child did not have a step-father, but stated Father was home, and denied the allegations. After Connors expressed a concern for Child's mental health, Child began meeting with a therapist at the Hamilton Center.

[3] On January 13, 2016, Child's therapist reported to Connors that Child had stated the rape did occur and that Mother and Father drank frequently. Child's therapist also expressed a concern for the level of supervision Mother and Father were providing Child and stated that Mother, who suffers from seizures, "'check[s] out' due to her health issues." Exhibits, Volume 3 at 20. DCS, Mother, and Father entered into an informal adjustment to provide services to address Child's mental health needs, in which Mother was provided with a home-based caseworker and required to submit to random drug screens. By May 2016, DCS received a report from Child's school that Child had seventeen unexcused absences in the second semester of the school year, ten excused absences, and three unexcused tardies. Child also had nineteen discipline reports in the first semester due to "academic noncompliance, dress code violations, misconduct, tardies, attendance violation, insubordination[,] and lying to a teacher/staff[,]" and five reports in the second semester for attendance violations. Corrected Appellant's Brief at 10-11.

[4] In August, Child reported violence and a lack of supervision to Connors and reported running away from home while Mother was "drunk and passed out[.]" Corrected Appellant's Appendix, Volume 2 at 36. In a meeting with Mother, Connors observed cuts and bruises on Mother, who indicated she got the injuries from falling. Mother disclosed that she is depressed as a result of living in Father's home and that she drinks to cope with her depression. Mother also reported that Child told her "she doesn't want to be alive." *Id*. at 37. Child

disclosed running away from home again and stated she would prefer living in foster care than with Mother and Father.

[5] On another occasion, in September 2016, Child ran away instead of attending school and was found in the woods by Father. Child's attendance problems persisted, and Child was failing a majority of her classes. On September 26, DCS received a report that Child was late to school and "crying hysterically." *Id*. Child stated that Father had slapped Child across the face and reported violence at home between Mother, Father, and one of Mother's sisters. Despite "[m]ultiple safety plans" and an informal adjustment, problems continued and DCS removed Child from the home the same day. Ex., Vol. 3 at 14.

[6] On September 27, DCS filed its Verified Petition Alleging a Child to be a Child in Need of Services ("CHINS") alleging Child was a victim of Mother and Father's inability, refusal or neglect to meet their parental responsibilities based on the facts outlined above:

> The [C]hild's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the [C]hild's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and the [C]hild needs care, treatment, or rehabilitation that the [C]hild is not receiving; and is unlikely to be provided or accepted without the coercive intervention of the Court.

Corrected Appellant's App., Vol. 2 at 29.

Child was placed with Child's paternal grandmother until October 3 when Child ran away and she was then placed with Youth Services. Mother and Father admitted Child was a CHINS at the detention hearing and the juvenile court held a dispositional hearing on October 18, at which Father failed to appear. In its dispositional order, the juvenile court accepted DCS' pre-dispositional recommendations, awarded DCS wardship of Child, and found:

> The needs of [C]hild for care, treatment, or rehabilitation are: Residential Placement and psychiatric treatment, education and supervised contact with the parents; Parents need to maintain sobriety from drugs and/or alcohol, need to learn how to communicate effectively with each other and [C]hild and understand [C]hild's needs and set clear boundaries on roles.

> Participation by the parent, guardian, or custodian in the plan for the child is necessary to: to assist parents in being sober and appropriate caregivers for [C]hild to provide a safe and stable environment for [C]hild free from physical altercations; to provide [C]hild with level of supervision [Child] needs; to assist parents in obtaining and providing mental health services for [C]hild.

> * * *

> [Child] will receive the following services until further review and order of the Court: Child to remain in placement in residential placement in Resource, receive mental health services, education and supervised visitation with parents.

*Id.* at 42-43. As a result, DCS referred Father and Mother to submit to random drug screens, complete home-based casework, domestic violence classes,

parenting classes, and psychological evaluations. Additionally, Father was referred to fatherhood engagement and therapeutic supervised visits and DCS referred Mother to substance abuse individual outpatient therapy and individual therapy.

[8] The juvenile court held periodic review hearings throughout the CHINS matter. Adoption and legal guardianship were added to the permanency plan. At a review hearing on August 17, 2017, the juvenile court found Mother and Father to be non-compliant with the case plan and sentenced them to serve ten days in the Putnam County Jail for contempt. In October 2017, the juvenile court held a permanency hearing and again found that Mother and Father were "minimally participating" in services and non-compliant with the case plan. *Id.* at 9. Despite significant efforts by DCS to engage Mother and Father in services, neither had complied with the plan by the next review hearing.

[9] On January 23, 2018, DCS filed its Verified Petition for Involuntary Termination of Parent-Child Relationship and the juvenile court held a review hearing. At that time, the juvenile court found Mother and Father had not "enhanced their ability to fulfill their parental obligations . . . [and] only minimally complied with recommendations in this matter." Ex., Vol. 3 at 81. Reunification was then removed from Child's permanency plan. The juvenile court held a fact-finding hearing on May 1 and issued its order terminating Mother and Father's parental rights as to Child on May 18. The juvenile court found, in part:

1. Evidence shows that Mother has another child who is not in her care.

2. Father was substantiated against for sexual abuse of Child when she was very young.

3. Evidence shows that Parents were given an opportunity to participate in an informal adjustment prior to the CHINS case, but that failed to result in meaningful change.

4. Parents each have a significant substance abuse problem that impacts their ability to parent Child.

5. Father has a significant criminal history of drinking and driving offenses that spans close to three decades.

6. Father's arrests and related criminal charges have failed to result in meaningful change.

7. Mother has a substance abuse problem and has continued to abuse alcohol for the CHINS case and during pendency of the termination.

8. Father has a substance abuse problem and has continued to abuse methamphetamine for the CHINS case and during pendency of the termination.

9. The [family case manager] and service providers made reasonable efforts to involve Parents in services.

10. Father failed to comply with the Dispositional Order by failing to maintain sobriety and availing himself of the services offered to him.

11. Mother failed to comply with the Dispositional Order by failing to maintain sobriety and availing herself of the services offered to her.

12. The Child was never returned to Mother or Father's care or custody following the removal.

\* \* \*

15. Child signed a consent and voluntarily attended an adoption event for children to meet potential adoptive families, and has received interest from two families.

\* \* \*

17. Parents showed a pattern of unwillingness or inability to meaningfully engage in services.

18. Evidence shows that Parents['] lack of effort has a causal connection to emotional damage to Child.

19. Evidence indicates that Child has been a victim of neglect and lack of supervision for a long time.

20. Father's most recent positive methamphetamine screen was during a visit less than a month ago.

21. Evidence shows that DCS and services providers altered and adjusted services in attempts to find programs that would engage Parents.

22. Parents have a history with DCS.

23. Father has failed to maintain employment.

24. Father failed to participate in numerous drug screens.

25. Mother failed to even take a tour of an intensive program to treat her addiction.

26. Evidence of Parents ongoing substance abuse issues pose a threat to Child's well-being.

27. Parents have demonstrated a pattern of failure to participate in the services needed, and the neglect that results from their substance abuse is likely to continue.

28. Parents have failed to demonstrate a willingness to put Child's needs above their own.

29. Parents ignored many attempts to engage and cajole them into participating.

* * *

35. [T]here is a reasonable probability that the conditions that resulted in the Child's removal from the home of Mother and Father will not be remedied, or that continuation of the parent-child relationship poses a threat to the well-being of each Child.

36. [T]ermination of the parent-child relationship is in the best interests of the Child[.]

Corrected Appellant's App., Vol. 2 at 10-14. Mother and Father now appeal.

# Discussion and Decision

## I. Standard of Review

The Fourteenth Amendment of the United States Constitution protects a parent's right to raise his or her children. *In re D.D.*, 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied*. "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). This right is not absolute, however, and must be "subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *In re D.D.*, 804 N.E.2d at 264-65. Therefore, "[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." *Id.* at 265.

Involuntary termination of the parent-child relationship is the "most extreme sanction" and thus, considered a "last resort, available only when all other reasonable efforts have failed." *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied*, 534 U.S. 1161 (2002). In conducting our analysis, we are mindful that the purpose of terminating the parent-child relationship is to protect children, not to punish parents. *In re D.D.*, 804 N.E.2d at 265.

When reviewing a termination of parental rights, we do not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628

(Ind. 2016).  We consider only the evidence and reasonable inferences most favorable to the judgment and afford "due regard" to the juvenile court's unique position to judge the credibility of the witnesses.  *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016) (quoting Ind. Trial Rule 52(A)).  When a juvenile court issues findings of fact and conclusions of law, we apply a two-tiered standard of review.  *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009).  We first determine whether the evidence supports the findings, and then determine whether the findings support the judgment.  *Id.*  This court will set aside the juvenile court's judgment only if it is clearly erroneous, i.e., when it is unsupported by the findings and conclusion entered on those findings.  *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 198-99 (Ind. Ct. App. 2003).  This court will reverse a termination of parental rights only upon a showing of clear error which leaves us with a "definite and firm conviction that a mistake has been made."  *Id.* at 199.

## II. Remedy of Conditions

[13]    Mother and Father first challenge the juvenile court's finding that there was a reasonable probability the conditions that resulted in Child's removal will not be remedied.  They contend the State failed to meet its burden of demonstrating that Mother and Father's domestic violence, substance abuse issues, and physical violence would not be remedied.

[14]    The juvenile court issued findings of fact and conclusions of law in its order terminating Mother and Father's parental rights.  *See* Ind. Code § 31-35-2-8.  To

terminate the parent-child relationship, the State must prove by clear and convincing evidence:

> (B) that *one* (1) of the following is true:

>> (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

>> (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

>> (iii)  The child has, on two (2) separate occasions, been adjudicated a child in need of services.

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2)(emphasis added); *see also* Ind. Code § 31-37-14-2 (providing the burden of proof in termination proceedings).

[15]    Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court was only required to find that one of the three elements of subsection (b)(2)(B) was established by clear and convincing evidence. *In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009).  Here, the juvenile court found

the evidence supported (b)(2)(B)(i) *and* (b)(2)(B)(ii).  Concluding the first element, (b)(2)(B)(i), is met, we need not address the second element.[1]

[16]     In determining whether the conditions that led to removal are likely to be remedied, we engage in a two-step analysis:  we first identify the conditions that led to Child's removal, and then determine whether there is a reasonable probability that those conditions will not be remedied.  *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 647 (Ind. 2015).  The second step requires the juvenile court to evaluate a parent's fitness to care for a child at the time of the termination hearing and consider a parent's pattern of conduct to determine whether there is a "substantial probability of future neglect or deprivation of the children."  *In re T.F.*, 743 N.E.2d 766, 774 (Ind. Ct. App. 2001), *trans. denied*.  In doing so, the juvenile court may consider a parent's criminal history, substance abuse issues, history of neglect, failure to provide support, lack of adequate housing and employment, and services offered by DCS to a parent and the parent's response to those services.  *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*.

---

[1] Mother and Father briefly challenge the juvenile court's finding that termination of the parent-child relationship is in Child's best interest.  In their brief, Mother and Father explicitly "dispute the [juvenile c]ourt's determination under I.C. 31-35-2-4(b)(2). . .(C)"  and state that "[t]ermination of the parental rights of Mother and Father are [sic] not in the best interest of [Child]."  Corrected Appellant's Br. at 25, 30. However, any potential argument challenging Child's best interest stops there and is therefore waived under Indiana Appellate Rule 46(A)(8)(a), which requires that the argument "contain the contentions of the appellant on the issues presented, supported by cogent reasoning.  Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on[.]"

[17]     Although concerns about Mother and Father's ability to parent Child began in 2007, DCS most recently became involved in 2015 to investigate an alleged kidnapping and rape of Child, as well as substantiated allegations of neglect due to lack of supervision and Mother and Father's inability to meet Child's mental health needs. Transcript, Volume 2 at 29-30. Child was ultimately removed because "[t]hings were escalating in the home." *Id.* at 30. Mother and Father were not compliant with services, Child continued to be absent from school and had run away four times, a domestic violence altercation occurred between Mother and Mother's sister, and substance abuse and lack of supervision persisted.

[18]     As to facts relating to Child's continued removal from Mother and Father, the juvenile court found that both parents have a "significant substance abuse problem" and have failed to maintain sobriety or engage in services during the pendency of the CHINS and termination matters, ultimately demonstrating a "pattern of unwillingness or inability to meaningfully engage in services[,]" which negatively affects Child's mental health. Corrected Appellant's App., Vol. 2 at 10-11. Mother and Father argue the "lack of any continued evidence of domestic violence and/or physical altercations would support a finding that [they] had remedied these two conditions[.]" Corrected Appellant's Br. at 29. We disagree.

[19]     In its order, the juvenile court focused on Mother and Father's lack of progress and failure to meaningfully engage in services. The record reveals DCS offered a variety of services to Mother, including substance abuse individual outpatient

therapy, home-based casework, individual therapy, random drug screens, and parenting and domestic violence classes. Linda Connors, DCS family case manager, testified that Mother did not complete individual therapy because Mother did not like the therapist, so Connors offered to obtain different therapists or provide transportation to Terre Haute for other types of outpatient individual therapy. Mother indicated she wanted to continue with her current therapy but never returned.

[20] Katherine Richards, community specialist case manager assigned to Mother, testified that Mother would not return phone calls and would often cancel the day before or morning of a scheduled meeting. In a team meeting, Richards and Mother discussed the possibility of inpatient treatment at Tara Treatment Center. Mother stated she would be more comfortable if she and Richards went to tour the facility. However, Mother cancelled each scheduled appointment at Tara for various reasons, including the cold weather and having "too many things to do that day[,]" and she never toured the facility. Tr., Vol. 2 at 71. Richards has continued to make efforts to engage Mother in services by calling her once a week; however, Richards has only received one return call from Father who "hung up abruptly." *Id.* Ultimately, Mother did not avail herself of the services DCS offered to a "substantial degree[.]" *Id.* at 38.

[21] Similarly, Connors stated that Father did not avail himself of the services offered to him. DCS referred Father to fatherhood engagement, home-based casework, domestic violence and parenting classes, drug screens, and therapeutic supervised visits. Father contends he advised DCS he had

previously participated in multiple "IOPs"[2] but those programs did not work for him; yet "DCS continued to offer the same type of services that Father advised DCS had not been successful for him . . . and did not offer any alternative services for his substance abuse issues." Corrected Appellant's Br. at 27-28. Father's argument here fails because the law concerning termination of parental rights does not require DCS to offer services to a parent to remedy deficient parenting. *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000).

[22] Despite the services offered to him, Father only "dabbled in a couple of the services, . . . [and] was never successful in finishing one service." Tr., Vol. 2 at 35. Although Father completed an intake for the fatherhood engagement program, Whitney Mallow, case manager for the program, testified that it took "six to seven attempts to get the intake scheduled" with Father and he demonstrated "minimal interest[.]" *Id*. at 88. Mallow testified that Father's presence at scheduled meetings "wasn't typical" because he would frequently not show up. *Id*. at 89. She also stated there was "never growth from visit to visit" and described going over the same information at the meetings. *Id*. at 92. Ultimately, "[t]here was never progress that [she] ever witnessed during [their] time together" and Father did not obtain employment. *Id*.

---

[2] Although "IOP" is not defined in the record, we believe this refers to an intensive outpatient program to address substance abuse.

At the fact-finding hearing, Connors explained that she managed the child family team meetings ("CFTM") and testified:

> CFTM meetings were pretty rough. Either [Mother and Father] no-showed or they couldn't get to our office. There was always some kind of an excuse why they couldn't be there. [Father] would always state that he was working when he could never show proof of employment. Sometimes we'd have to – we'd have all service providers at the DCS office. We would pick up and go to their home just to meet with them on the CFTMs. . . .

*Id*. at 46.

Additionally, Connors stated that Mother and Father's behavior at some of the meetings was inappropriate and concerning. Connors detailed the first CFTM, which Mother, Father, Connors, a home-based caseworker, and Child's therapist attended:

> [Father] actually just kind of sat there and stared at a paper for about 45 minutes. About 45 minutes later, he just kind of popped his head up and asked where [Child's] therapist was, who was actually sitting next to him and had been participating in the meeting the entire time. Other times we would have CFTMs where [Father] was extremely argumentative, constantly blame[d] DCS for being in this position, would not take accountability. We even had [Child] at some of the CFTMs, which was very concerning because the one that we had [Child], I think it was last fall, [Father] made it very clear to [Child] that – he would whisper it to [Child], kind of stare right at [Child] and say, you know, people are trying to keep us apart, almost making it kind of like a conspiracy, that he's doing everything that he needed to, even though they weren't. So it was very concerning.

*Id*. at 47.

Throughout these proceedings, Mother and Father have failed to engage in services indicating little likelihood of changed conditions. At the review hearing in January 2018, the juvenile court found Mother and Father have "continue[d] to evade drug screens and services offered to them[,]" failed to cooperate with DCS, and Mother admitted to drinking heavily. Ex., Vol. 3 at 82. Most recently, Mother refused a drug screen several weeks prior to the fact-finding hearing. Ultimately, Mother and Father's non-cooperation with DCS and failure to engage in services "reflects an unwillingness to change existing conditions." *A.F. v. Marion Cty. Office of Family & Children*, 762 N.E.2d 1244, 1252 (Ind. Ct. App. 2002), *trans. denied*. Moreover, Mother and Father fail to appreciate how their lack of compliance emotionally harms Child. *See* Tr., Vol. 2 at 38. Tina Araujo, visitation supervisor, observed Child and testified that Child expresses "[a] lot of frustration" and is "very, very upset" when Mother and Father refuse or fail a drug screen. Tr., Vol. 2 at 78.

In addition, the juvenile court found Mother and Father have substance abuse problems that have continued throughout the CHINS case and termination proceedings. Mother and Father challenge this finding, arguing the State failed to prove this condition would not be remedied. In support of this argument, Mother and Father highlight the fact that they both submitted to numerous drug screens, stating Mother submitted to "at least 28 drug screens . . . 65% of those screens were negative" and Father submitted to "at least 30 drug screens . . . 60% of those of those screens were negative[.]" Corrected Appellant's Br.

at 27. Although Mother and Father submitted to some drug screens, the record reveals multiple instances of their refusal to submit to drug screens. Given their refusal, the statistical information Mother and Father rely on cannot be a complete and accurate reflection of their sobriety.

[27] The evidence in the record demonstrates that Mother and Father have not remedied their substance abuse issues. Connors testified that Father has not maintained sobriety, based on his drug screens, and tested positive for methamphetamine around August 2017. In fact, Mother and Father's recent conduct highlights that these issues have not been remedied or improved. In January 2018, Mother admitted to drinking heavily and Richards testified that Mother appeared intoxicated at a January meeting. On April 4, just weeks before the fact-finding hearing, Father was charged with operating a vehicle while intoxicated, reckless driving, and resisting law enforcement. Shortly thereafter, Father tested positive for methamphetamine and refused a drug screen one week prior to the fact-finding hearing. Father has an extensive criminal history involving alcohol and driving indicating a concerning pattern of substance abuse.[3]

[28] In their brief, Father and Mother contend they engaged with DCS and various service providers "to help move their case forward" by attending parenting time, the CFTM meetings, and participating in classes. *Id*. at 28. As previously

---

[3] At the time of DCS' assessment in 2007, Father already had roughly nine operating while intoxicated offenses and has since accumulated additional OWI convictions.

discussed, neither parent meaningfully engaged in the services. They argue "DCS admitted that [Mother and Father] did show improvement while the cases were pending." *Id*. at 28. Mother and Father's statement refers to Connors' testimony that "there was a little bit of improvement" during the time when Mother tried "Cummins [for individual outpatient therapy] and then she wasn't able to maintain. [Father] . . . was kind of dabbling with the Hamilton Center . . . [but] it was a hit or miss with him. [DCS was] still getting positive screens, a lot of no-shows or refusals for the random drug screens." Tr., Vol. 2 at 40. However, when a parent demonstrates only temporary improvement and the "pattern of conduct shows no overall progress," the juvenile court may reasonably find the "problematic situation will not improve." *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). Such is the case here.

[29] Connors testified that neither parent made any progress and she determined it was not likely that the conditions that led to Child's removal would be remedied. Mother and Father's prior history with DCS also supports this conclusion. Nonetheless, even if Mother and Father made some slight improvement, that improvement was brief. Rather, Mother and Father "have demonstrated a pattern of failure to participate in the services needed, and the neglect that results from their substance abuse is likely to continue." Corrected Appellant's App., Vol. 2 at 12. Because the record reveals a pattern of Mother and Father's inability to maintain sobriety, failure to engage in services, resulting in neglect and lack of supervision of Child, we cannot conclude the

juvenile court's finding that the conditions will not be remedied was clearly erroneous.

# III. Satisfactory Plan

Mother and Father also argue there is insufficient evidence to support DCS' claim that it has a satisfactory plan for the care and treatment of Child as required by Indiana Code section 31-35-2-4(b)(2)(D). Mother and Father contend that because Child was not in a pre-adoptive home at the time of the fact-finding hearing, only two families had expressed interest in adopting Child, and Child demonstrated hesitation about the decision to be adopted prior to the hearing, the State's claim that a satisfactory plan for the care and treatment of Child is in place is refuted. Mother and Father also argue that Child's behavior during recent visits demonstrates Child "does not want to be adopted." Corrected Appellant's Br. at 29.

A satisfactory plan need not be detailed so long as it provides a "general sense of the direction" of where the child will go after parental rights are terminated. *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 374 (Ind. Ct. App. 2007), *trans. denied*. A plan is satisfactory if DCS will "attempt to find suitable parents to adopt the children." *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied*. "[T]here need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent." *Id*.

[32] At the time of the fact-finding hearing in May 2018, Child was in foster care, not a pre-adoptive home. Connors testified that adoption was added to the permanency plan in July 2017 and although DCS had not found anyone to adopt Child in the ten months since, Connors stated that was due to DCS' focus on family members because legal guardianship had been added to the permanency plan in October. DCS began the adoption process on April 21, just weeks before the hearing. Connors stated, "There's a process that they have to review the entire file, do a child summary, those types of things." Tr., Vol. 2 at 59. At a recent social, two families expressed interest in adopting Child.

[33] Mother and Father do not cite to any authority to support their arguments regarding a satisfactory plan. Although DCS only recently began taking steps toward Child's adoption, it is clear DCS has attempted and will continue to attempt to find suitable parents to adopt Child. Therefore, sufficient evidence of a satisfactory plan was presented at the fact-finding hearing.

# Conclusion

[34] For the foregoing reasons, we conclude the evidence supports the juvenile court's finding that there is a reasonable probability that the conditions that led to Child's removal will not be remedied and a satisfactory plan for the care and treatment of Child exists. Therefore, the juvenile court's decision to terminate Mother and Father's parental rights was not clearly erroneous.

[35] Affirmed.

Baker, J., and May, J., concur.